## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| JILL MILLER, WAYNE MILLER, and MATTHEW MILLER, <br><br> Plaintiffs, <br><br> v. <br><br> GEORGIA DEPARTMENT OF TRANSPORTATION, PITTMAN CONSTRUCTION COMPANY, and CPL ARCHITECTS, ENGINEERS, LANDSCAPE ARCHITECT AND SURVEYOR, D.P.C. (P.C.) <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )       Civil Action No : <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

---

## VERIFIED COMPLAINT FOR CIVIL PENALITES, INJUNCTIVE RELIEF, DAMAGES AND ATTORNEYS' FEES AND EXPENSES OF LITIGATION

1.  Plaintiffs Jill Miller, Wayne Miller and Matthew Miller (collectively

referred to as "Plaintiffs), bring this citizen suit under the Federal Water Pollution

Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. 1365(a), against

Defendants the Georgia Department of Transportation, Pittman Construction and

CPL Architects, Engineers, Landscape Architect and Surveyor, D.P.C.

("Defendants"). This suit is based on Defendants' past and continuing discharges

of polluted stormwater containing significant amounts of silt, sediment, gravel,

construction waste, and other pollutants from construction and land disturbance

activities on the widening and reconstruction of SR 11/US 129 ("Project")
completed by Defendants in Talmo, Jackson County, Georgia, through pipes,
culverts, channels, failed erosion control measures and other point sources into
several waterbodies including tributaries to Allen Creek, ponds, wetlands adjacent
to the Creeks and tributaries, and into Plaintiffs' Property. These discharges are
without coverage under, and/or in violation of the terms and conditions of an
applicable National Pollutant Discharge Elimination System ("NPDES") permit,
and without coverage under an applicable dredge and fill permit.

2.   Plaintiffs Jill Miller, Wayne Miller and Wayne Miller (collectively referred
to as "Plaintiffs") also bring pendant state law claims of negligence per se,
negligence, nuisance, trespass, punitive damages, and attorneys' fees and expenses
of litigation against both Defendants regarding the damage to Plaintiffs' property,
including the ponds, creeks, tributaries, and wetlands from discharges of pollutants
and excess stormwater from Defendants project and land disturbing activities.

3.   Plaintiffs seek declaratory relief as well as an injunction ordering
Defendants to, inter alia, cease their violations of the Clean Water Act ("CWA"),
repair and/or remediate the creeks and tributaries, wetlands and ponds, pay civil
penalties to the U.S. Treasury, repair and restore Plaintiffs' Property from
substantial erosion and excessive siltation damage, restore pastures, repair/replace
driveways, repair/replace fencing, and reimburse Plaintiffs for costs and expenses

addressing damage and impacts to agricultural operations as well as attorneys' fees and expenses of litigation.

## PARTIES AND JURISDICTION

4.  Defendant Georgia Department of Transportation ("GDOT") is a subdivision of the State of Georgia.  Service may be provided at Georgia Department of Transportation, One Georgia Center, 600 West Peachtree NW Atlanta, GA 30308 to the Commissioner Russell McMurry, P.E.

5.  Defendant Pittman Construction Company ("Pittman") is a Georgia corporation with a principal place of business at 1487 Farmer Road NW, Conyers, GA 30012. Defendant Pittman has been authorized to transact business in the State of Georgia and may be served with process by serving its registered agent James Mann at 1487 Famer Road, Conyers, GA 30012.

6.  Defendant CPL Architects, Engineers, Landscape Architect and Surveyor, D.P.C. ("CPL") is a foreign professional corporation licensed to do business in Georgia. Its principal place of business is 3011 Sutton Gate Drive, Suite 130, Suwanee, GA 30024 and may be served with process by serving its registered agent Kevin McOmber at 3011 Sutton Gate Drive, Suite 130, Suwanee, GA 30024.

7.  Plaintiffs Jill and Wayne Miller own and reside at 111 Sosbee Road, Talmo, Jackson County, Georgia 30575.

8.  Matthew Miller resides at 433 Brooks Road, Pendergrass, Jackson County, Georgia, 30567.

9.  Plaintiffs are the owners of property who own, reside, recreate and operate commercial agricultural operations on Jackson County tax Parcels 108 019, 109 013, 108 007, 108 008 and 108 019A (collectively the "Property")

10. Plaintiffs use and enjoy their Property, the creeks, tributaries and ponds for commercial purposes operating a cattle farm and for recreation.

11.  Plaintiffs' Property is downstream from and adjacent to the Project for which Defendants were and are responsible.

12.  Defendant GDOT is responsible for the engineering, procurement and construction of the Project.

13.   Defendant Pittman is the business of contracting and constructing roadway transportation projects and completing Best Management Practices inspections.

14.  Defendant CPL is in the business of preparing engineering and erosion and sedimentation control plans required for land disturbing activities.

15.  On January 10, 2023 Plaintiffs sent Defendant GDOT and Pittman the attached 60-Day Notice of Intent to Sue and Demand to Abate Nuisance and Trespass Letter via certified mail. The allegations in this supplemental letter are incorporated by reference and a copy of the letter is attached as Exhibit "1".

16.  In compliance with 33 U.S.C. §1365(b)(1)(A) and 40 C.F.R. 135.3(a), these letters notified Defendants of the CWA violations on the Project and of Plaintiffs' intent to file a citizen suit after 60 days should the violations continue.

17.  Notice was also provided to the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of EPA, and the Director of the Georgia Environmental Protection Division ("EPD").

18.  More than sixty days have elapsed since Plaintiffs provided Defendants with notice, and Defendants have failed to cease the CWA violations, which are currently continuous and/or reoccurring with every rain event.

19.  Neither the EPD nor the EPA is currently prosecuting a pending civil or criminal action to redress the CWA violations alleged.

20.  This Court has exclusive jurisdiction over this case under §505(a) of the Clean Water Act. 33 U.S.C. §1365(a).

21.  This Court has supplemental jurisdiction over Plaintiffs' pendant state law claims under 28 U.S.C. §1367.

22.  Venue is proper in this judicial district and in this Court under 28 U.S. C. §1391(b) and 33 U.S.C §1365(c)(1) because Defendants' unpermitted discharges and/or discharges in violation of a permit that give rise to Plaintiffs' claims are located and occurring in the Gainesville Division of the United States District Court for the Northern District of Georgia.

## STATUTORY AND REGULATORY BACKGROUND
## I.    The Clean Water Act

23.   Objectives of the CWA include "to restore and maintain the chemical, physical and biological integrity of the Nation's waters" and to have water quality which provides for the protection of species.  33 U.S.C. §1251(a).

24.   To achieve these objectives, §301(a) of the CWA prohibits the "discharge of any pollutant by any person" except in compliance with the Act. 33 U.S.C. §13111(a).

25.   "Pollutant" means "dredged spoil, solid waste…garbage….biological materials…rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. §1362(6).

26.   Under Section 505(a)(1) of the CWA, any citizen may commence a civil action for injunctive relief or declaratory relief against "any person" alleged to be in violation of NPDES requirements and/or engaging in the unpermitted discharge of a pollutant. 33 U.S.C. §1365(a)(1).

27.   In an action brought under Section 505(a) of the CWA, the Court has jurisdiction to order Defendants to comply with the Act and to assess civil penalties under Section 309(d) of the CWA, 33 U.S.C. §1319(d).

28.   Section 309(d) of the CWA provides that any person who violates section 301 of the Act, 33 U.S.C. §1311 or violates any permit condition or limitation in a NPDES permit issued under 33 U.S.C. §1342, "shall be subject to a civil penalty"

payable to the United States for each violation. 33 U.S.C. §1319(d). Pursuant to 40 C.F.R. §19.4, the civil penalty to be assessed is $66,712.00 per day for each CWA violation that occurred after November 2, 2015 where the penalty is assessed after December 27, 2023. 40 C.F.R. 19.4 (2024).

29.  Additionally, under section 505(d) of the CWA, the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing party of substantially prevailing party, whenever the court determines that such award is appropriate." 33 U.S.C. §1365(d).

**II.     NPDES Construction Stormwater General Permits**

30.  Section 402 of the CWA, 33 U.S.C. §1342, establishes the National Pollutant Discharge Elimination System permitting program, which prohibits the discharge of pollutants from "point sources" into "waters of the United States" without an NPDES permit or in violation of the terms and conditions of an NPDES permit. See also 33 U.S.C. §1311.

31.  Section 502(14) of the CWA, 33 U.S.C. §1362(14), defines "point source" as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well [or] discrete fissure…from which pollutants are or may be discharged."

32.  The term "point source" also means sheet flow which is later conveyed via a point source to water of the United States.

33.  Pursuant to section 402(b) of the CWA, 33 U.S.C. §1342(b), EPA has delegated to EPD the authority to issue NPDES permits in the State of Georgia under the Georgia Water Quality Control Act, O.C.G.A. §§12-5-20 to -53 ("GWQCA").

34.  In Georgia, the CWA and GWQCA prohibit any person from discharging stormwater associated with construction activity without first submitting to EPD a valid Notice of Intent ("NOI") to be covered by NPDES Construction Stormwater General Permit No. GAR100001 ("Stand Alone Construction"), GAR100002 ("Infrastructure Construction"), and/or GAR100003 ("Common Development Construction") ("NPDES General Permits" or "General Permits"), and except in accordance with the limitations, monitoring requirements, and other conditions set forth in the NPDES General Permits.

35.  The NPDES General Permits require the owner and/or operator of construction site to prepare and submit to EPD an Erosion, Sedimentation, and Pollution Control Plan ("ESPC Plan") to obtain valid coverage under the permits.

36.  "Operator" under the CWA and NPDES General Permit includes an entity that has operational control of those activities at the construction site necessary to ensure compliance with the permit conditions and the requirements of the ESPC Plan for the construction site.

37.  Where there are multiple operators associated with the same project all operators must submit a Notice of Intent to obtain coverage under the General Permit.

38.  If an operator is required to obtain NPDES permit coverage but does not submit a Notice of Intent for its stormwater discharges from a construction site, then the resulting discharges constitute unpermitted discharges in violation of the CWA.

39.  Operators covered by the General Permits must ensure that all activities on the construction site comply with the requirements of the permit.

40.  The General Permits require ESPC Plans to "include, as a minimum, best management practices ('BMPs'), including sound conservation and engineering practices to prevent and minimize erosion and resultant sedimentation, which are consistent with, no less stringent than, those practices contained in the 'Manual for Erosion and Sediment Control in Georgia' (Manual) published by the State Soil and Water Conservation Commission as of January 1 of the year in which the land disturbing activity was permitted." Id.

41.  BMPs are "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent and minimize erosion and resultant sedimentation, which are consistent with, and no less stringent than, those

practices contained in the [Manual] to prevent or reduce the pollution of waters of Georgia." *Id.*

42. The General Permits require the use of BMPs for all construction activities which "must be implemented in accordance with the design specifications contained in the [Manual] to prevent or reduce the pollution of waters of Georgia." *Id.*

43. The General Permits provide that the owner and operator of a construction site "must implement and maintain the provisions of the [ESPC] Plan…as a condition of this permit." *Id.*

44. Under the General Permits, "the current permittee remains responsible for compliance with all applicable terms of the permit and for any violations of said terms." *Id*.

45. The "[f]ailure to properly design, install, or maintain [BMPs] shall constitute a violation of th[e] permit for each day on which such failure occurs" and "[i]f during the course of the permittee's routine inspection BMP failures are observed which have resulted in sediment deposition into Waters of the State, the permittee shall correct the BMP failures and submit a summary of the violations to EPD." *Id*.

46. A nephelometric turbidity unit ("NTU") is a numerical unit of measurement of water quality based upon photometric analytical techniques for

measuring the amount of light scattered by fine particles of a substance in suspension, including sediment and other pollutants.

47.  Under the General Permits, "a discharge of stormwater runoff from disturbed areas where [BMPs] have not been properly designed, installed, and maintained shall constitute a separate violation for each day on which such discharge results the turbidity of receiving water(s) being increased by more than…twenty-five (25) [NTUs]…regardless of permittee's [election to same outfalls]." *Id.*

48.  "When the permittee has elected to sample outfall(s), the discharge of stormwater runoff from disturbed areas where [BMPs] have not been properly designed, installed, and maintained shall constitute a separate violation for each day on which such condition results in the turbidity of the discharge exceeding the [NTU] value…[applicable] to the construction site." *Id*.

49.  Under the General Permits, "no construction activities shall be conducted within a 25 foot buffer along the banks of all State waters…except where the Director has determined to allow a variance…". *Id*.

50.  The General Permits state that "it is not a defense to compliance with this permit that a local government authority has approved the permittee's [ESPC] Plan or failed to take enforcement action against the permittee for violations of the [ESPC] Plan or other provisions of th[e] Permit. *Id.*

51.  The General Permits also specify that discharges shall not cause a violation of water quality standards, that, in turn, state: "All waters shall be free from turbidity which results in a substantial visual contrast in a water body due to man-made activity." Ga. Comp. R. & Regs. 391-3-6-.03(5)(d).

52.  The limitations and conditions of the General Permits apply to owners and operators of a construction site until it has undergone final stabilization, all stormwater discharges associated with construction activity that are authorized by the General Permits have ceased, the site is in compliance with the General Permit, all temporary BMPs have been removed, and the owners and operators submit signed Notices of Termination ("NOTs") to EPD.

### III.    Dredge and Fill Permits

53.  Section 404(a) of the CWA, 33 U.S.C. §1344(a), establishes a program administered by the United States Army Corps of Engineers ("USACE") for the discharge of dredged or fill materials into the waters of the United States.

54.  Section 404 requirements are distinct from, and in addition to, the NPDES permit framework in section 402, 33 U.S.C. §1342.

55.  Section 404 prohibits the "discharge of dredged or fill material" into Waters of the United States except in accordance with a permit issued by the USACE ("Section 404 Permit"). 33 U.S.C. §1344.

56.  "Dredged material" is "material that is excavated or dredged from waters of the United States," including "[t]he runoff or overflow from a contained land or water disposal area." 33 C.F.R. §§323.2(c) and (d)(1) (2024).

57.  "Fill material" is "material placed in the waters of the United States" where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States. 33 C.F.R. §323.2(e)(1) (2024). "Examples of fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from… excavation activities, and materials used to create any structure or infrastructure in the waters of the United States." 33 CFR §323.2(e)(2).

58.  "[D]ischarge of fill material" means "the addition of fill material into the waters of the United States," including, without limitation the following activities: "Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses." 33 C.F.R. §323.2(f) (2024).

59.  The USACE has the authority to issue individual permits or "general permits on a state, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material." 33 U.S.C. §1344(e)(1).

## IV.   Georgia Law

60.      "Suggested Pattern Jury Instructions," Fifth Edition 2021, Council of Superior Court Judges of Georgia:

46.010  Nuisances; Definition

A nuisance is anything that causes hurt, inconvenience, or damage to another. The fact that the act done may otherwise be lawful shall not keep it from being a nuisance.  The inconvenience complained of shall not be fanciful or such as would affect only one of extraordinary or demanding taste, but it shall be such as would affect an ordinary, reasonable person. O.C.G.A. §41-1-1.

61.  46.030  Nuisances; Reasonable Use of Property, Duty of

The privilege of use incident to the right of property must not be exercised in an unreasonable manner so as to inflict injury upon another unnecessarily. To constitute a nuisance, the use must be such as to produce actual, tangible, and substantial injury to neighboring property or such as to interfere sensibly with its use and enjoyment by persons of ordinary sensibilities. *Holman v. Athens Empire Laundry Co.*, 149 Ga. 345 (1919). *Gordy v. Armstrong*, 190 Ga. 670, 679 (1940).

62.  "[T]he obligation imposed on every member of society by law [is] to conduct himself and use his property as not to injure others." A person is under a duty so to use his own property as not to injury another. *Smith v. Clarke Hardware*, 100 Ga. 163, 28 S.E. 73 (1897); *City of Albany v. James*, 39 Ga. App. 379, 147 S.E. 396 (1929).

63.   Every act of another which unlawfully interferes with one's right of enjoyment or possession of her own property is a tort for which an action shall lie. O.C.G.A. §51-9-1 et. seq.; O.C.G.A §51-10-1 et. seq.; *Berger v. Plantation Pipeline C*o., 121 Ga. App. 362, 364, 173 S.E. 2d 752 (1970).

64.   Private property cannot be physically harmed or its value impaired, however socially desirable the conduct, without payment being made for the harm done, if the interference that is the consequence of the activity is substantial and considered to be unreasonable.  *Sumitomo Corp. V. Deal*, 256 Ga. App. 703 (2002); *Fielder v. Rice Constr. Co.*, 239 Ga. App 362 (1999).

65.   A trespass is an unauthorized entry on the property of another, without the consent the owner of the property on which the alleged trespass is committed. *Webster v. Snapping Shoals Electric Membership Corp.,* 176 Ga. App. 265 (1985); *Shaheen v. G & G Corp.*, 230 Ga. 646 (1973); *Kingsley Mill Corp. V. Edmonds*, 208 Ga. 374 (1951); *Gill v. First Christian Church, Atlanta, Georgia, Inc.*, 216 Ga. 454 (1960); *Southern Mutual Investment Corp. V. Langston*, 128 Ga. App. 671 (1973); *Roughton v. Theile Kaolin Co.*, 209 Ga. 577 (1953).

66.   "In the case of a nuisance involving runoff of surface water, 'actual damages as such, i.e., injuries, are evidenced by a showing that the property owners are deprived of the full use and enjoyment of their property by the

increased flow of surface waters or sediments on it.'" *Baumann v. Snider*, 243 Ga. App. 526, 528, 532 S.E.2d 468, 472 (2000).

67.  Pursuant to the Georgia Water Quality Control Act, the term 'Waters' or 'waters of the state' means any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells and all other bodies of surface or subsurface water, natural or artificial, laying within or forming a part of the boundaries of the state which are not entirely confined and retained completely upon the property of a single individual, partnership, or corporation. O.C.G.A. §12-5-22(13).

68.  Pursuant to the Georgia Water Quality Control Act – Rules and Regulations promulgated by the Georgia Department of Natural Resources Environmental Protection Division:

> All waters of the state shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with legitimate water uses; and All waters of the state shall be free from turbidity which results in a substantial visual contrast in a water body due to man-made activity. O.C.G.A. §12-5-22(13); Rules and Regulations 391-3-6-03(5)

69.  Compliance with regulations does not prohibit a jury from concluding an activity is a nuisance. *Sumitomo Corp. V. Deal*, 256 Ga. App. 703 (2002); *Galaxy Carpet Mills, Inc. V. Massengill*, 255 Ga. 360 (1986); *Stone Man Inc. V. Green*, 263 Ga. 470 (1993).

## **BACKGROUND FACTS**

70.  SR 11/US 129 (referred to as the "Highway") is located adjacent to, upgradient of, and/or upstream of Plaintiffs' property.

71. The expansion and modification of the Highway is referred to as GDOT project PI #122150 (referred to as the "Project").

72.  The Project diverted water from the Highway modifying the concentration and velocity of stormwater to Plaintiffs' Property and the creeks, tributaries, wetlands, and ponds.

73. For decades Plaintiffs have relied without incident on the ponds, creeks and tributaries for the necessary water supply for the cattle operations and the pastures for grazing as shown in the photographs dated below.



74.     On or around October 23, 2018 Defendant GDOT submitted Notice of Intent (NOI) for coverage under a NPDES General Permit for NH000-0002-

06(051) / BHN00-0002-06(038), PI# 122150/121340, which stated it covered 165.9 acres for disturbance. Rich Williams of GDOT was listed as the owner and no duly authorized representative or Facility/Construction Site Contact was provided.

75. The NOI identified Ephemeral Ditch 9, 13, 41, 42 & Pond Form Tributary as the receiving waters and water supporting warm water fisheries and associated turbidity limits of 25 NTU.

76. Those "state waters" flow adjacent to and through Plaintiffs' property, into Allen Creek, a tributary to the Middle Oconee River, which joins the Ocmulgee River to form the Altamaha River, flowing into the Atlantic Ocean.

77. On or about November 2021, Plaintiffs began noticing that increased volumes and concentrations of water from the Project were being directed towards its property bringing silt, sediment and increasing the volume and velocity of water being directed onto Plaintiffs' Property resulting in damage.

78. During rain events, Defendants activities resulted in the discharge of polluted stormwater containing silt, sediment, gravel, construction waste, and other pollutants into the creeks, tributaries, wetlands and ponds on Plaintiffs' Property from ditches, rills, ponds, outlets, culverts, improperly designed, installed and/or maintained BMPs, construction equipment, and other point sources in violation of the terms and conditions of the NPDES General Permit.

79.  The water being directed from the Project was significantly more than had been historically, causing erosion and sedimentation damage and further siltation to Plaintiffs' Property.

80.  Defendants knew it was their duty not to pollute Plaintiffs' Property.

81.  BMPs designed, installed and maintained by Defendants adjacent to the Highway are inadequate, have failed and continue to fail and have not been properly maintained. Structures are suffering severe erosion adjacent and under the constructed elements as shown in the photographs from July 12, 2023.

 

82.  Defendants construction activities associated with the Project increased the volume and velocity of water leaving the Highway onto Plaintiffs' Property and pollute Plaintiffs' Property with silt, sediment, trash and discolored/turbid water.

83.  Increasing the volume and velocity of the water leaving the Highway transposes the erosion on the Highway right-of-way property to Plaintiffs' Property, causing increased damage to Plaintiffs.

84.  Defendants' failed to design, install and maintain adequate erosion controls and BMPs.

85.  The BMPs installed were inadequate and overwhelmed by rain events, sending muddy silt-ladened water and sediment onto Plaintiffs' Property filling the creeks and flooding the pastures in the December 27,2022 photographs below.

 

86.   Failures of BMPs resulted in the release of sediment to waters of the State.

87.  The December 13, 2021 email from Defendant CPL employee Rich Edinger to Defendant GDOT employee Bryan Lott states the drainage pipe is

installed per the drainage profiles; however the pipe shown on the plans is in the wrong location. The installed pipe is washing out the bench of the slope and requested to move the bench, repair the slope and install rip rap outlet protection on the slope, acknowledging the error and the resulting damage to Plaintiffs' Property. (Exhibit 2)

88.  Additional elements were incorrectly located on the plans as shown with the driveway to Plaintiffs' pasture being constructed away from the pasture gate, prohibiting its usefulness as shown in the March 21, 2023 photo.



89.  EPD personnel AJ McAlister completed a site inspection on Plaintiffs' Property on January 12-13, 2022 and prepared a report stating that (1) BMPs were not properly designed, installed and/or maintained; (2) failure to conduct final

stabilization; (3) significant impact to state waters; and (4) site does not reflect ESPC Plan (Exhibit 3).

90.  Within the report, EPD documented that Stream 16 was impacted due to the full and unmaintained sediment pond discharging sediment-laden water and that excessive sediment migrating into the pond from full and unmaintained rock check dams, missing filter rings below outlets and unmaintained rip rap aprons on both sides of the Site from Stations 190-195; Along Station 190-202+00 RT, required channel stabilization was missing and sediment was migrating down the channels from eroded rills and gullies in the slopes above that drain into storm pipe X 19 that discharges to the sediment pond; inspection records indicate ~12 rock check dams in these areas were removed over 2 months ago due to a change in construction and no BMPs were re-designed. Significant sediment has entered Stream 13 due to the removal of rock check dams, no stabilization or channel protection on the right side of Site at St. 185-189 about 2 months ago and this runoff discharges through the stream 13 culvert pipe, X17." (Exhibit 3)

91.  EPD further noted in its January 2022 inspection report: "slope failure was observed on both sides of the Stream 13 stream pipe outlet at St. 185 Lr (left side) due to poor stabilization and possibly inadequate design. The Plan indicates this pipe, the adjacent slopes, and an ~125 ft long bench slope was constructed on top of Wetlands 14 and 15." (Exhibit 3).

92. "Defendants installed new rows of silt fence on top of previous rows of silt fence at the toe of slopes in this area that were full of sediment from the erosion". (Exhibit 3)

93. "EPD documented sediment off site from several areas at this location migrating directly into Stream 13." EPD further observed polymer was illegally applied to the outlet rip rap apron in Stream 13. Streams 16 and 13 merge into Stream 12 which has been documented to be significantly impacted with sediment from the Project Site. (Exhibit 3)

94. Within the January 2022 report EPD documented that "Stream 8 is heavily impacted with sediment at St. 180+50 LT from gully erosion and poor stabilization of slopes. New silt fence was observed to be installed on top of two rows of full silt fence at the bottom of the slopes here also." (Exhibit 3).

95. Excessive sediment was observed to be in Stream 10 emanating not only from the right side of the project where sediment from gully erosion and undermined silt fence was documented to be entering Stream 10 but also the slopes above the outlet on the left side of the site is eroding into the Stream 10. (Exhibit 3)

96. "A rock check dam is installed in Stream 8." (Exhibit 3)

97. "Sediment was documented to leave the Site and enter Wetland 9 that drains into Stream 6." (Exhibit 3)

98.   Inspection reports do not show the rock check dams along St. 175-185+00 RT that drain into Stream 10 were removed but no stabilization was completed nor alternative BMPs designed or installed. "No self-reports have been received. Recent site inspections were reviewed, and no violations were noted on the reports."  (Exhibit 3)

99.   EPD site inspections noted violations but the reports prepared by Defendant Pittman stated the site was in compliance, contrary to the findings of EPD.

100.    EPD issued a notice of violation to Defendant GDOT on February 16, 2022 (Exhibit 4).

101.    EPD found that sediment was in the stream due to unmaintained sediment pond, Defendants had removed rock check dams without stabilization or channel protection and that slope failures were observed due to poor stabilization and possibly inadequate design. (Exhibit 4)

102.    EPD further noted that sediment was migrating directly to streams on Plaintiff's Property, streams 16, 13, 12 and 8 were heavily impacted by sediment and that Defendants had applied polymer to the outlet rip rap apron which is illegal. (Exhibit 4).

103.     The February 16, 2022 Notice of Violation required that the ESPC

Plan be revised and BMPs installed along with the maintenance of existing BMPs

be completed within seven days of the Notice of Violation, by February 25, 2022.

104.     Defendant GDOT acknowledged in its March 2, 2022 email to

Plaintiffs "agreed the newly constructed outfalls installed per the plans on this

project are causing erosion issues on your property. However GDOT is

coordinating with design to develop a plan to address the outfalls that are causing

these issues….GDOT and Pittman will coordinate closely to develop a plan that

will restore your property to an agreed and acceptable condition. We agreed to

follow back up with you in one week to update you on the plan moving forward

and will continue to update until all issues are resolved." (Exhibit 5)

105.     EPD conducted a follow up site inspection on March 3, 2022 to

document corrective action noting that turbid water continues to enter waters of the

state from unmaintained sediment pond. EPD report determined the (1) BMPs not

properly designed, installed and/or maintained; and (2) failure to conduct final

stabilization. (Exhibit 6).  EPD recommended water quality sampling to be taken to

address the turbid water entering State Waters.

106.     A second notice of violation was issued on March 22, 2022 for

continued sediment deposition offsite and in Waters of the State. (Exhibit 7)

107.    As of March 22, 2022, per the EPD 2nd NOV, no revisions had been completed as requested in the February 16, 2022 Notice of Violation.

108.    Channel stabilization continued to be missing, no self-reporting for sediment impacts had been received as required under the NPDES permit; and no EPSC Plan revisions had been completed within the timeframe required by the NPDES permit.

109.    By email dated March 24, 2022 on behalf of GDOT, Wil Cole stated to Plaintiffs that designers were reviewing issues to provide resolutions and contractors were continuing to perform BMPs adjacent to Plaintiffs' Property and throughout the project.

110.    By email dated March 31, 2022 Defendant GDOT employee Wil Cole stated that: (1) to address the cross drain pipe near STA 180+50: The erosion is occurring after the water leaves the rip rap apron. In order to remedy this, it appears the drainage channel from the rip rap apron to the Stream #8 buffer should be lined with rip rap. Additionally, the sediment will be removed so the channel can keep flowing south rather than into the field. This will require a temporary construction easement from you to perform the work. As soon as an agreement for the temporary construction easement is made the contractor will be able to proceed with this work. I will provide a temporary construction form next week. (2) To address areas where run-off has prevented permanent slope stabilization designers

have recommended to armor the slope with rap rip. The contractor has been given direction to proceed with this work as soon as weather will allow. (Exhibit 8).

111.    By email dated April 1, 2022, Defendant GDOT emailed Plaintiff Jill Miller and stated "the concerns on your property will have to be addressed once we can determine assess the easements that would be required for the concerns on your property. This can be address once we know the concerns are resolved on our side as noted in the previous email I sent.  I hope this helps." (Exhibit 9).

112.    Defendants acknowledged that the Project was causing harm to Plaintiffs' Property but did not provide the temporary easement form, knowing that without this remediation Plaintiffs' Property would continue to suffer damages.

113.    On April 6, 2022 Defendant GDOT submitted a self-report for NPDES sediment loss to GAEPD, admitting sediment onto six locations of Plaintiffs' property during an EPD complaint inspection on January 13, 2022 and stated that it would need to obtain permission from the property owner to access their land for clean-up efforts to take place.  At this time The Department cannot accurately quantify the amount of sediment loss nor the amount that will need to be removed from the property." (Exhibit 10)

114.    Despite Defendants submission to EPD, Defendants did not request permission or provide the access form to assess the land for the necessary cleanup.

115.     On April 18, 2022 EPD conducted another follow up site inspection and documented that turbid water continued to enter streams. EPD recommended water sampling, rip rap below the pond outfall needed to be replaced due to being covered in sediment; rills/gullies continued to form and informed Defendants that more effective BMPs were needed. (Exhibit 11)

116.      Defendants GDOT and Pittman stated that had a meeting with design professionals Defendant CPL scheduled the next week. NPDES permit condition requires that the Plan be revised within seven (7) days but the Plan was not revised until weeks later.

117.     EPD documented that sediment had been placed in Stream 10 as identified on the construction drawings. There was no permit for the placement of fill or sediment within the stream and EPD directed Defendants to remove the sediment from the water, which they did not do. The February 28, 2023 photograph below shows stream 10 no longer flowing due to sediment.



118.    Water quality sampling at locations 189+00 and 180+50 LT side exceeded the NTU value in the NPDES permit constituting a violation of the permit.

119.    By email dated April 28, 2022 EPD requested GDOT complete all Plan revisions by May 6, 2022.

120.    On April 28, 2022, Defendant GDOT submitted a self-report of sediment loss found during the April 18, 2022 EPD inspection reiterating the sediment within the six locations of Plaintiffs' Property and the need to obtain permission to clean up the property. (Exhibit 12)

121.    Defendants again did not seek permission to access and clean Plaintiffs' Property.

122.    The May 6, 2022 water quality sampling report prepared by Defendant Pittman states the NTU value in excess of permitted limits at sites 185+00, 180+50 and 189+00 along Plaintiffs' Property.

123.    On May 18, 2022 EPD representatives conducted a follow up inspection and determined (1) BMPs not properly designed, installed and/or maintained; and (2) failure to conduct final stabilization. (Exhibit 13).

124.    Rills and gullies were still forming and needed more effective BMP design and/or maintenance. The report noted that "GDOT will submit an explanation on why delay in full repair of slopes". (Exhibit 13).

125.    Water quality sampling on May 23, 2022 at location 185+00 failed to meet the required NTU limits within the NPDES permit.

126.    Water quality sampling on May 27, 2022 at locations 180+50 and 185+00 exceeded NTU water quality requirements of the NPDES permit.

127.    Plaintiffs submitted an open records request for files on June 30, 2022 which Defendant GDOT responded would take an additional ten business days to respond. GDOT provided a response on September 7, 2022, constituting unnecessary delays.

128.    Plaintiffs communicated with Defenant Pittman about the erosion undermining the fence and causing issues with the cattle escaping the pastures and

was provided a text response of "Ok. I'll handle that." No action from Defendants

GDOT or Pittman was taken on the fencing.

129.    Plaintiffs provided Anti-litem notice to Defendant GDOT on July 25,

2022 (Exhibit 14).

130.    On October 3, 2022 Defendant GDOT provided a 'Georgia Liability

Incident' form which included the February 7, 2022 Damage Claim Form to be

sent to Defendant Pittman in which Plaintiffs responded by submitting the form

notifying the Defendants that erosion and water was running under the driveway.

Defendants GDOT and Pittman chose not to repair/replace.

131.    No response was or has been provided by Defendants to Plaintiffs'

Damage Claim Form.

132.    Plaintiffs provided Defendants GDOT and Pittman a 60-day notice of

Intent to sue for violations of Section 402 of the Federal Clean Water Act on

January 10, 2023.

133.    On January 13, 2023 Plaintiff provided a supplemental anti-litem

notice to Defendant GDOT that Defendants had filed to provide design

modifications and additional erosion and sedimentation control measures stipulated

in email correspondences in April through June 2022. Plaintiffs requested that all

artificial stormwater discharges be addressed, remediate roadway drainage

facilities, remove sediment deposited on Plaintiffs' Property and restore the

Property. The notice included Defendant GDOTs failure to provide marked

documents from an in-person inspection, rain quality data as required under the

NPDES permit. (Exhibit 15).

134.    The dates and locations of the permit violations and/or illegal

discharges include but are not limited to those specified in the attached exhibits.

135.    Defendants' operation and ownership of construction activities at the

Project have greatly increased the volume of stormwater discharged into the

Creeks, tributaries, wetlands, ponds and Plaintiffs' Property compared to

predevelopment conditions and caused excessive erosion and siltation on the

Property resulting in damages as well as the inability of Plaintiffs to run their cattle

operations in the manner that was customary.

136.    Defendants' operation and ownership of construction activities at the

Project increased the peak rate of stormwater discharged into the Creeks,

tributaries, wetlands, ponds and Plaintiffs' Property as compared to

predevelopment conditions.

137.    The increases in rate and volume of stormwater discharged into the

Creeks, tributaries, wetlands, ponds and Plaintiffs' property have damaged those

waterbodies and have caused (1) erosion and pollution of the Creeks and their

tributaries, (2) filling of the wetlands, (3) excessive sedimentation of the Creeks,

tributaries and ponds, (4) erosion and sedimentation of Plaintiffs' property; and (5) modified hydrology of the Plaintiffs' pastures.

138.    Defendants have repeatedly violated and continue to violate the terms and conditions of the NPDES General Permits, including those terms and conditions specified in the attached exhibits.

139.    Defendant GDOT as the operator was and is responsible for the prevention of violations of the CWA, for monitoring erosion and sedimentation controls at the Project and for ensuring implementation of BMPs to ensure compliance with the General Permit.

140.    Defendants submitted a Notice of Termination ("NOT") on April 12, 2023 certifying "indicating that construction is complete activities have ceased and final stabilization has been completed. (Exhibit 16)

141.    On the Notice of Termination Defendants certified "I certify under penalty of law that either: (a) all storm water discharges associated with construction activity authorized by this permit have ceased, the site is in compliance with this permit and all temporary BMPs have been removed or (b) I am no longer an Owner or Operator at the construction site and a new Owner or Operator has assumed operational control of the permitted construction site where I previously had ownership or operational control or (c) coverage under the permit for an existing infrastructure construction project is not required under Part I.C.1.

of NPDES General Permit No. GAR100002; and that discharging pollutants in storm water associated with construction activity to waters of Georgia is unlawful under the Georgia Water Quality Control Act and the Clean Water Act where the discharge is not authorized by a NPDES permit."

142.    Defendants checked the box on the Notice of Termination that "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that certified personnel properly gather and evaluate the information submitted. Based upon my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations."

143.    Contrary to the certification within the Notice of Termination, temporary BMPs are still onsite contrary to the certification, contradicting that final stabilization is complete, constituting a false statement and additional violations of the CWA as shown in the photograph of conditions as of February 21, 2024.



144.    The terms and conditions of the NPDES Construction Stormwater General Permits have continued to illegally discharge pollutants from the Project into the Creeks, tributaries, wetlands, ponds and caused general erosion and damage to Plaintiffs' Property.

145.    The failure to stabilize the Project site, disregard EPD's direction to Defendants to remove the sediment from waters clearly demonstrates Defendants will continue to violate the requirements of CWA section 404 by continuing to illegally deposit fill material into Waters of the United States including the Creeks, their tributaries, and their wetlands and not abide by the terms of the NPDES permit.

146.    EPD has visited the Plaintiffs' Property on numerous occasions and have noted the significant discharge of silt, sediment and excessive increase of water onto Plaintiffs' Property.

147.    Defendants' permit violations and illegal discharges have damaged and continue to damage the creeks, tributaries, wetlands, ponds and Plaintiffs' Property.

148.    Defendants' permit violations and illegal discharges have damaged and continue to damage Plaintiffs by forcing Plaintiffs to pull the cattle from pasture areas that have become flooded and purchase supplemental feed. Several cattle died from bad hay that had to be purchased to supplement the feed since the pastures are not available due to the damage resulting from the Project.  These cattle would not have died but for the damage to the pastures not allowing them to graze on natural pasture grasses.  The creeks and ponds have been silted in or now have inadequate water quality which does not allow adequate water for the cattle. The Affidavits of Jill Miller provides examples of the harm caused by Defendants' permit violations and is attached as Exhibit "17".

149.    Hydrophytic vegetation is now present in Plaintiffs' pastures and areas of the pastures are too wet to allow cattle to graze without getting hoof rot or stuck in the mud. Several cattle have been pulled from areas where they were sunk

in mud causing safety issues such as shown in the photograph of the calf being half way immersed in mud.



150.    Defendants activities have caused and continue to cause violations of the CWA and damage to Plaintiffs making Defendants liable for such violations and damage.

151.    Defendants have failed to remediate Plaintiffs' Property for pastures and used as temporary retention; constructed a driveway to a fenced area not in line with the existing gate to provide access; improperly designed and constructed two concrete driveways that have been undercut from erosion and sedimentation. Photographs of the drives are shown below.





152.    Prior to the Project, water drained to the creeks and ditches and did

not result in flooding of the pastures. This allowed cattle to graze these areas only

requiring minimal feed to supplement what was available in the pasture.

153.    The erosion from the Highway Project has caused significant erosion

on Plaintiffs' Property which has caused tree falls and instable areas and stream

banks, causing further erosion and sedimentation onto Plaintiffs' Property. The

photograph below taken on September 1, 2023 shows the tree fall that occurred

due to erosion from the Highway Project.



154.     It no longer matters if there is a rain event. Plaintiffs' Property has

been modified by filling up the streams and ditches causing the pastures to flood,

changing hydrology of Plaintiffs Property and creating wetlands.

155.     The wet conditions have undermined the fencing, requiring

replacement to assure cattle will not leave the property.  The instability of the

fencing is shown in the photograph from May 15, 2023 below.



156.     The problems Defendants have created will not go away absent intervention by the Court.

157.     Defendant GDOT is responsible for compliance with all applicable terms of Defendants' permit(s) and for any violation of said terms.

158.     Defendants GDOT and CPL failed to conduct a hydrology study to determine impacts from diverting water outside the Project corridor to determine if its activities would result in significant volumes of water being discharged from the Project as compared to the natural discharge of water therefrom.

159.     Defendants GDOT and CPL failed to maintain a project specific drainage notebook documenting all necessary calculations used for stormwater design as required in Defendant GDOT's Drainage Manual. Defendant GDOT has refused to produce the project specific notebook for the Project.

160.    Defendant GDOT and CPL failed to complete downstream hydrologic analysis for basins draining to Plaintiffs' Property that had an increase in post-construction stormwater as required under Section 10.2.3 of the GDOT Drainage Manual which states "for projects such as reconstruction and/or widening the designer must evaluate post-development peak flows to determine if increased flows would cause flooding, spill outside of channel banks, overtop a road, result in some other adverse effects on downstream properties or if detention will increase downstream flows."

161.    Defendant CPL failed to provide the calculations for each check dam and rock filter dam in the ESPC plans as required per ESPC Plan requirements.

162.    Defendant CPL failed to include the velocity of the channels or ditches as required on the ESPC Plan.

163.    The Project took the water from both sides of the Highway and conveyed water under the Highway to discharge into stream 7 as identified on the plans to completely fill the stream with sediment and create a gully/ravine on Plaintiffs' Property as shown on the photographs below.

 

|  March 2023  |  July 2023  |

164.     Despite the obvious damage to Plaintiffs' Property, Defendants have not revegetated the bare ground on the Project and adjacent to Plaintiffs' Property.

165.     Defendants have acknowledged that they have caused and are causing damage to Plaintiffs and Plaintiffs' property.

166.     Defendants misconduct, diversion of water and pollution of Plaintiffs' Property has materially and severely diminished the use of Plaintiffs' Property.

167.     Defendants' misconduct has made necessary the future expenditure of extraordinary sums of money to repair and remediate the damage, such as the deposition of sediment and silt on Plaintiffs' Property both in the streams that flow into the Plaintiffs' property, the ponds and the pastures and replacement of culverts/pipes on Plaintiffs' Property.

168.     Defendants' misconduct has significantly diminished the value of

Plaintiffs' Property and the use which serves as the basis for their livelihood and

caused the expenditure of additional resources to provide feed and water for their

livestock.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
(Ongoing Violations of Sections 301 402, and 404 of the CWA)
Defendants GDOT and Pittman

169.     Plaintiffs incorporate by reference the factual allegations in

Paragraphs 1 through 168.

170.     Defendant GDOT is the permittee listed in the NOI for the Project and

is responsible for compliance with all applicable terms of Defendants' permit and

for any violations of said terms.

171.     Defendants have conducted clearing, grading, excavating, filling of

land and other construction activities for the expansion of the Project.

172.     Defendants have failed and continue to fail to properly design, install

or maintain BMPs at the Project in violation of the NPDES General Permits and

the CWA on the dates and locations included in, but not limited to the notice letters

attached hereto and within the Notice of Violations and reports issued by EPD.

173.     During their control and/or operation of construction activities,

Defendants have discharged stormwater polluted with silt, sediment and other

pollutants from pipes, channels, failed erosion control measures and other point

sources without valid coverage under the NPDES General Permit in violation of the CWA and deposited silt in Waters of the US without the necessary Section 404 permit under the CWA.

174.     Based on data and evidence collected by Plaintiffs, their consultants, representatives and agents, and as concluded by EPD the BMPs in the right-of-way and on the Project are still not properly designed, installed and/or maintained.

175.     The foregoing conduct by Defendants including their past and ongoing discharges of heavily polluted stormwater containing silt, sediment, and other pollutants, from pipes, channels, ponds, gullies, culverts, failed erosion control measures, and other point sources on the Project and onto Plaintiffs' Property, creeks, tributaries, wetlands and ponds, without valid coverage under, and/or in violation of the terms and conditions of the NPDES General Permit, violated and continues to violate sections 301 and 402 of the CWA.

176.     Defendants were directed by EPD to remove the sediment within creeks and wetlands of Plaintiffs' Property and have not done so resulting in a continuing violation of Section 404.

177.     Defendants filed a NOT without final stabilization and failed to remove temporary BMPs in violation of Section 402.

178.     Defendants have failed to cease their violations of sections 301, 402, and 404 of the CWA and these violations are continuous.

179.     Plaintiffs are entitled to attorneys' fees and expenses pursuant to 33

U.S.C. §1365(d) of the CWA. Additionally, civil penalties and injunctive relief

should be imposed against Defendants for past and ongoing violations of the

CWA.

## SECOND CLAIM FOR RELIEF
### (Negligence Per Se)
Past and/or Ongoing Violations of the CWA

180.     Plaintiffs incorporate by reference the factual allegations in

Paragraphs 1 through 176.

181.     Defendants past and ongoing discharges of excessive and heavily

polluted stormwater from the Project into the Creeks, tributaries, wetlands, pond

and Plaintiffs' Property violated and continue to violate several statutes including

sections 301, 402, and 404 of the CWA.

182.     Defendant GDOT as Primary Permittee is responsible for these

violations.

183.     Defendant CPL certified compliance with the requirements of the

ESPC Plan that failed to meet the standards.

184.     Defendant Pittman certified that its inspection reports for ESPC Plans

were correct but were in fact shown to be erroneous by EPD site inspections and

reports.

185.     Defendants violations of the CWA and NPDES General Permits were intentional and/or the result of their failure to exercise ordinary care.

186.     The harm to Plaintiffs is the type of harm the statutes were designed to guard against, and Plaintiffs fall within the class of persons these statutes are intended to protect.

187.     Through violations of these statutes, Defendants breached duties owed to Plaintiffs.

188.     The violations of these statutes were the direct and proximate cause of damages to Plaintiffs in amounts to be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Negligence)

189.     Plaintiffs incorporate by reference the factual allegations in Paragraphs 1- 189.

190.     Defendants GDOT and Pittman have a duty to undertake land disturbance and/or construction activities with a degree of care that an ordinarily prudent person would exercise under the same or similar circumstances and with the degree of care that every prudent person takes of his own property of a similar nature. O.C.G.A. §51-1-2.

191.     Defendants had and have a duty to use properly designed, installed and maintained BMPs when undertaking land disturbing and/or construction activities and operations on the Project.

192.     Defendant CPL has a duty to design best management practices compliant with the legal requirements and standards.

193.     Defendants had a duty to adhere to GDOT requirements and internal specifications, including maintaining the Project book, which they failed to do.

194.     Defendants had and have a duty not to pollute or damage Plaintiffs' Property so as to interfere with the use or enjoyment of it by, or lessen the value to Plaintiffs' Property.

195.     Defendant Pittman had the duty to complete inspection of erosion control measures but failed to note the violations and insufficiencies.

196.     Defendant CPL had the duty to prepare the plans in accordance with the Best Management Practices and make timely revisions pursuant to the NPDES permit but failed to do so.

197.     Defendants breached these duties owed to Plaintiffs.

198.     The breaches of these duties were the direct and proximate cause of damages to Plaintiffs and Plaintiffs' Property in amounts to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Nuisance)

199.     Plaintiffs incorporate by reference the factual allegations in Paragraphs 1 -198.

200.     Defendants past and ongoing discharges of excess and heavily polluted stormwater from the Project onto Plaintiffs' Property caused Plaintiffs' hurt, inconvenience and/or damage to Plaintiffs' Property and constitute a continuing nuisance as the term is defined in O.C.G.A. §41-1-1.

201.     Defendant GDOT as the primary Permittee, is responsible for undertaking land disturbing and construction activities in a manner so as not to cause these discharges and have and continue to fail to do so.

202.     Defendant Pittman had a duty to conduct construction activities and land disturbing activities in accordance with the ESPC plans but failed to do so.

203.     Defendants' land disturbance and development activities on the Project have resulted in the continuous and excessive discharge of water, eroded soils, silt, sediment, debris, muddy water, and other pollutants from the Project and associated right-of-way onto Plaintiffs' Property.

204.     These continuous and excessive discharges have caused damage to Plaintiffs' Property and have interfered with Plaintiffs' full use and enjoyment of their property as they see fit. That damage to the Plaintiffs and their property is substantial, material and unreasonable.

205.     Defendants continuous and excessive discharges and diversions of water, eroded soils, silt, sediment, debris, and muddy water from the Project and associated right-of-way site and onto Plaintiffs' Property constitutes a continuing nuisance within the meaning of O.C.G.A. §41-1-1 for which Defendants are liable to Plaintiffs.

206.     Plaintiffs are entitled to damages for the costs to repair and/or dredge the ponds, restoration of the creeks and creation of gullies on Plaintiffs' Property from excessive erosion and concentration of water, reimbursement of loss of cattle and other operational expenses and other damages in amounts to be determined by the enlightened conscious of a jury.

## FIFTH CLAIM FOR RELIEF
### (Trespass)

207.     Plaintiffs incorporate by reference the factual allegations in Paragraphs 1- 206.

208.     Defendants' past and ongoing discharges of excess and heavily polluted stormwater from the Project onto Plaintiffs' Property constitute a trespass pursuant to O.C.G.A. §51-9-1.

209.     Defendant GDOT as primary permittee and Defendant Pittman as the contractor are and were responsible for undertaking land disturbance and construction activities in a manner not to cause these discharges and continue to fail to do so. Defendant CPL was responsible for preparing plans that would not

result in activities that would cause these discharges and then make timely revisions to address any trespass.

210.    As a result of Defendants activities on and for the Project, Defendants have knowingly, willfully and intentionally discharged excessive volumes of water, eroded soils, silt, sediment, muddy water, and other pollutants onto Plaintiffs' Property and violated Plaintiffs' right to exclusive possession of their property.

211.    These invasions of Plaintiffs' Property and Plaintiffs' Property rights caused by Defendants' actions and omissions were not in any way sanctioned or permitted by Plaintiffs at any time.

212.    These un-permitted invasions of Plaintiffs' Property have resulted in the deterioration of Plaintiffs' Property and the water courses thereon.

213.    Defendants continuous discharge of excessive water, eroded soils, silt, sediment, muddy water, and other debris onto Plaintiffs' Property constitutes a continuing trespass for which Defendants are liable to Plaintiffs.

214.    As a direct and proximate result of Defendants' continuing trespasses, Plaintiffs and their property have been damaged, and Plaintiffs should be compensated in an amount and manner to be determined at trial. Plaintiffs are entitled to damages for the costs to restore Plaintiffs' Property, reimbursement of

costs for impacts to cattle operations and for other damages in amounts to be determined by the enlightened conscience of a jury.

## SIXTH CLAIM FOR RELIEF
### (Punitive Damages)
### Defendant Pittman and Defendant CPL

215.     Plaintiffs incorporate by reference the factual allegations in Paragraphs 1- 214.

216.     Before doing any construction activities, Defendants knew that it was foreseeable that the damage that has been caused to Plaintiffs' Property would result from these activities.

217.     Defendants intended the results that were foreseeable to Defendants.

218.     What is foreseeable can be avoided; refusing to avoid the foreseeable makes the conduct irrefutably intentional.

219.     During the Project and prior to bringing this action, Defendants had knowledge that their activities were causing excessive water, eroded soils, silt, sediment, muddy water, and other debris to be discharged from the Project and onto Plaintiffs' Property and causing Plaintiffs' Property substantial damage through erosion.

220.     Defendants, having knowledge of these problems, refused to engage in actions that would prevent the continuous discharge of water, eroded soil, silt, sediment, muddy water and other debris from the site and onto Plaintiffs' Property.

221.    Defendants conduct has been and continues to be wanton and reckless and manifests a conscious indifference to the damaging consequences.

222.    Defendants' conduct as above described warrants and demands the imposition of punitive damages against Defendants pursuant to O.C.G.A. §51-12-5.1 and in amount to be determined at trial.

223.    Plaintiffs repeatedly asked Defendants over the past two (2) years to cease discharging excess and heavily polluted stormwater from the Project and right-of-way into the Creeks, their tributaries, their wetlands, and Plaintiffs' Property, and Defendants agreed to restore the Property but Defendants have failed to take effective and appropriate action to remedy the situation and the ongoing damage.

224.    Defendants have a history of operating the Project in other locations where their work resulted in the primary permittee receiving violations for failing to design, install and maintain appropriate BMPs at other locations within the Project in 2019. These violations resulted in Defendant Pittman removing 5 cubic yards of sediment from the stream based on a July 18, 2019 self-report.  This served as notice of the potential damages and injury that could occur later in the Project and did on Plaintiffs' Property.

225.    Defendants Pittman and CPL were notified of the damage to Plaintiffs' Property, acknowledged that the plans were incorrect and causing

damage, failed to timely revise the plans and assured repairs to Plaintiffs' Property but took no action.

226.     Defendants' past and ongoing discharges of excess and heavily polluted stormwater from the Project are willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which raises the presumption of conscious indifference to the consequences of such actions to Plaintiffs' Property.

227.     Defendants acted and failed to act with the specific intent to cause harm to Plaintiffs' Property and interfere with Plaintiffs' use and enjoyment of same such that the jury may impose punitive damages in excess of the statutory cap of $250,000.

## SEVENTH CLAIM FOR RELIEF
### (Attorneys' Fees and Expenses of Litigation)

228.     Plaintiffs incorporate by reference the factual allegations in Paragraphs 1- 228.

229.     Plaintiffs have repeatedly requested Defendants over the past two (2) years to cease the discharges of excess and heavily polluted stormwater from the Highway construction and associated right-of-way onto Plaintiff's Property, but Defendants have failed to take effective actions to remedy the situation and the ongoing damage.

230.    Through this and other actions and omissions, Defendants have acted in bad faith, or have been stubbornly litigious, or have caused Plaintiffs unnecessary trouble and expenses within the meaning of O.C.G.A. § 13-6-11 and all other appliable Georgia law, such that attorneys' fees and expenses of litigation shall be allowed as part of the damages in this case.

## EIGHTH CLAIM FOR RELIEF
### (Injunction)

231.    Plaintiffs incorporate by reference the factual allegations in Paragraphs 1- 230.

232.    Defendants' development activities have created a continuing, abatable trespass and nuisance from which Plaintiffs and their Property, will suffer irreparable injury and for which Plaintiffs have no adequate remedy at law.

233.    Plaintiffs are entitled under this Court's power of equity to a permanent injunction ordering Defendant GDOT to cease all discharges of excessive water, eroded soils, silt, sediment, discolored, muddy water, and other debris from the Project site and onto Plaintiffs' Property.

## WHEREFORE PLAINTIFFS PRAY FOR THIS COURT:

A.    That a summons issue requiring Defendants to appear as provided by law to answer this Complaint.

B.    That service be had upon Defendants as provided by law.

C.     That Plaintiffs have jury of all issues so triable.

D.     Enter judgment in favor of Plaintiffs on all of their claims for relief;

E.     Declare under the federal Declaratory Judgment Act and under § 505 of the CWA that Defendants are liable and/or derivatively liable for violations of §§ 301, 402, and 404 of the CWA;

F.     Impose federal civil penalties against Defendants of $66,712.00 per violation of the CWA per day under § 505(a) of the CWA;

G.     Issue a temporary and/or permanent injunction ordering Defendants to cease their violations of the CWA, including further illegal and unpermitted discharges of pollutants from the Project and associated right-of-way into the Creeks, tributaries, ponds and wetlands, immediately take all necessary steps to come into permanent and consistent compliance with the CWA, and remove the pollutants discharged into the wetlands, creeks, tributaries and ponds on Plaintiffs' Property;

H.     Award Plaintiffs' attorneys' fees and expenses of litigation including expert witness fees under § 505(d) of the CWA and/or under O.C.G.A. §13-6-11;

G.     That punitive damage be imposed against the Defendants Pittman and CPL in such amounts as the jury concludes is sufficient to deter the Defendants from the kind of wrongdoing described herein.

H.    Enter an order that the Court shall maintain jurisdiction over this action until Defendants come into consistent and permanent compliance with the CWA and comply with every order of this Court in this action including any Judgment, Order, and/or Consent Decree entered by this Court; and

I.    That Plaintiffs have and recover general damages from the Defendants for Plaintiff's' loss of use and enjoyment of their property, damages incurred associated with the cattle operations and costs expended to maintain access and in such amount that the jury concludes are appropriate;

J.    For such other and further relief to which Plaintiffs may be entitled at law or equity, as the Court shall deem just and appropriate.

DEMAND A TRIAL BY JURY
Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted, this 15th day of March 2024.

BENZ LAW

Laura W. Benz
GA Bar 000489
19 W. Broad Street
Newnan, GA 30259
(404) 437-7789
Laura@LWBenz.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing document was prepared using 14-point

Times New Roman Font.

Respectfully submitted, this 15th day of March 2024.

BENZ LAW

_____
Laura W. Benz
GA Bar 000489
19 W. Broad Street
Newnan, GA 30259
(404) 437-7789
Laura@LWBenz.com

## **VERIFICATION OF PLAINTIFF MATTHEW MILLER**

Personally appeared before me, an officer duly authorized by law to

administer oaths, **MATTHEW MILLER** who states under oath that the facts

contained within the foregoing Complaint for Civil Penalties, Injunctive Relief,

Damages and Attorney's Fees and Expenses of Litigation are true to the best of her

knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

_____
Matthew Miller

Sworn to and subscribed before me
this 1⁀ day of March, 2024

_____
Notary Public
My Commission Expires:

> MADELINE MCCARTHY
> Notary Public, Georgia
> Hall County
> My Commission Expires
> July 30, 2024

59

## **VERIFICATION OF PLAINTIFF WAYNE MILLER**

Personally appeared before me, an officer duly authorized by law to

administer oaths, **WAYNE MILLER**, who states under oath that the facts

contained within the foregoing Complaint for Civil Penalties, Injunctive Relief,

Damages and Attorney's Fees and Expenses of Litigation are true to the best of her

knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

_____
Wayne Miller

Sworn to and subscribed before me
this 11 day of March, 2024

_____
Notary Public
My Commission Expires:

MADELINE MCCARTHY
Notary Public, Georgia
Hall County
My Commission Expires
July 30, 2024

## <u>VERIFICATION OF PLAINTIFF MATTHEW MILLER</u>

Personally appeared before me, an officer duly authorized by law to

administer oaths, **MATTHEW MILLER** who states under oath that the facts

contained within the foregoing Complaint for Civil Penalties, Injunctive Relief,

Damages and Attorney's Fees and Expenses of Litigation are true to the best of her

knowledge and belief.

FURTHER AFFIANTS SAYETH NOT.

_____
Matthew Miller

Sworn to and subscribed before me
this ⅃⅃ day of March, 2024

_____
Notary Public
My Commission Expires:

MADELINE MCCARTHY
Notary Public, Georgia
Hall County
My Commission Expires
July 30, 2024

59